on Mayville. The district court held in this case that an officer is entitled to do nothing to advance the mission of a traffic stop so long as a computer check is running somewhere in the background. The district court held that the troopers could properly complete the records check pursuant to the traffic stop before investigating their suspicions about Mayville's impairment. This rule from the district court is directly contrary to the rule in Rodriguez in which the Supreme Court, again, building on decades of jurisprudence requiring diligence on the part of officers at every point during a traffic stop, ruled once again that officers can't earn bonus time by setting things up so that they have free time to undertake investigations unrelated to the mission of the traffic stop. Now, at Trooper Tri-Potty, it's clear from the context of this case, was in fact doing nothing for portions of the running of the triple I computer check. So he had two reasons. I don't quite read what I've read so far that he was doing nothing and what caused the stop. What caused the stop was... I know what caused the stop. As I understood what you just said, that your client was doing nothing. No, no, no. Trooper Tri-Potty was doing nothing during portions while the computer check was running. I apologize for misunderstanding Judge Balduck. Well, let me ask you this to follow up on Judge Balduck's question. In McRae footnote 6, doesn't the court, whether it's dicta or holding, say that a triple I check is a reasonable precaution for officer safety? And so even if the officer was doing nothing other than a triple I check, isn't that a significant part of what he needed to do for his safety? McRae? No, Judge Bacharach, for a couple of reasons. The first reason is McRae and all of this court's jurisprudence has been perfectly clear about the Fourth Amendment balancing that has gone on in determining whether a criminal history background check is an acceptable part of a routine traffic stop. So the balancing that happens in McRae is that this is an instantaneous traffic stop. I think the language in McRae, there are four different times in that one footnote that McRae talks about how fast this is, but it's instantaneous. And this is the language that's picked up in this court's en banc opinion in hold, is that this is something that happens contemporaneously with writing the citation. So Fourth Amendment balancing test is the importance of the government's interest and the severity of the intrusion on individual liberty. So in McRae and Holt, when that balancing test is done, the intrusion on individual liberty is non-existent because it's instantaneous. It doesn't add to the length of the detention at all under those circumstances. And I would like to point out as a sort of factual background matter that McRae is a case from 1996 in which the triple I from an out-of-state car and an out-of-state driver's license returned instantaneously. In this case, 24 years later, it took 12 minutes to return a triple I check. Computers have not gotten slower in the last 24 years. They've gotten faster. So this is a very different circumstance on the intrusion on individual liberty side. It's also, I would argue, a government interest in officer safety side of the equation. It makes sense to return a criminal history check to help an officer out if he's going to get it right away. If he's going to find out, oh, wait a minute, this is a really dangerous guy. I need to be careful here. Then his safety is actually improved. I think it's much to be questioned whether officer safety is enhanced. In fact, whether it might not be harmed. Do you agree that if this panel decides that a triple I check was appropriate here that you lose? I think the Supreme Court has held that Just a simple question, yes or no. Do you lose or opines that a triple I check in this case was appropriate and did not extend the stop? If it didn't, if this court finds that it didn't extend the stop, that's a more problematic argument for us. But the triple I can be appropriate at its inception and become inappropriate as time drags on. If you have a pending triple I, you don't have the information, it can terminate the stop and let the person go on? It could mean that. It could also mean the officer should try another method. The officer here in this case clearly had different methods for checking for a triple, for everything. He had an onboard computer which returned results in 25 seconds. Do you agree it's a factual question whether or not the traffic stop was unreasonably extended? I'm sorry, Your Honor, I didn't Is that a factual question, whether the stop was unreasonably extended? No, the reasonableness of a detention is always a de novo. In the decision of the district court, it said, in sum, the court finds that Officer Tripodi did not unconstitutionally extend the traffic stop by conducting a records check pursuant to the valid stop of Mayville's car. Now, isn't that a factual finding? It's a, no, I think it's a legal determination to the extent that it's a question of reasonableness, which is always reviewed by this court de novo. Well, but that takes me back to Rodriguez, because Rodriguez, which you're relying on, clearly says that the courts are not supposed to second guess the logistical choices that the officers may make in place. But Rodriguez says they have to be diligent at all times, and criminal history checks But you're saying that with this computer, he should have been able to do this in five seconds and everything. We don't know whether he had trouble with it or whatever. But we are, under your argument, going to have to say logistically there was something wrong, and I just don't see that yet. But the Fourth Amendment analysis undertaken by this court frequently requires line drawing  Well, do you agree that Rodriguez says what I just told you about us not being able to second guess the logistical parts of what officers may do? I would tend to disagree, Judge Baldock, to the extent that it says that, and it does say, that officers are required to be diligent throughout the stop. And this is not unique to Rodriguez. This court in the mid-80s in Sharp, which is cited in the brief, says the police are required to diligently pursue a means of investigation likely to confirm or dispel their suspicions quickly. We do have a lot of, or we have some authority out there, but I want to know what your best case, the one if you only had one case to rely on in this argument, that says that the officers are not permitted to run a triple-I check in a reasonable basis? I'm not arguing that officers cannot ever run a triple-I check. I'm arguing that that ability is subject to the same requirements of diligence, of reasonableness, of all four things. Which is your best case? The one case you're going to rely on. Rodriguez is very clear about diligence and about the requirement of reasonableness. So you don't agree with Judge Murphy that what he just read to you a minute ago is a factual matter? I think the determination of the reasonableness of anything in a traffic stop is a question that is a legal one that this court reviews de novo. Reasonableness, in my understanding, has pretty much always been a factual question, isn't it? Unless you're arguing a constitutional issue or something like that? I'm going to stay with my position, Judge Baldock, that I think the reasonableness decision is one this court reviews de novo, that the reasonableness of an officer's actions during a traffic stop are reviewed de novo. I understand that. The court did find that the dog sniff, an indication by the dog, occurred during the time when the officer was waiting for the information on the triple I check, correct? That is correct. Doesn't that necessarily mean that your whole case rises and falls on whether or not the triple I check is an appropriate means of investigation? The case rises or falls on whether a police officer is entitled to run a check in a way and wait for a check as long as it takes, as long as, you know, what if it took an hour? What if it took five minutes? If it took five minutes, that would be a different question on these facts than it would have actually returned quickly. So if the triple I check had taken five minutes as opposed to 12, then we would affirm? It would depend on how it mapped onto the facts of this case. It would depend on what else was happening at the time. Based on exactly the same facts that took place otherwise, because then you have this case mapped perfectly onto McRae, because there the traffic stop took a total of five minutes, right? Yes, that would be a different question. So if it took eight minutes, should we say halfway between the facts in McRae and in our case, then would we, exercising de novo review as you've asked us, what do we do then? Is that an unreasonable extension of the traffic stop? It depends on what else is going on. Exactly the same facts that we otherwise have. So what I'm saying is it's not a question strictly of five minutes versus eight minutes versus 12 minutes. It's a question of, is the officer diligently trying to finish up this stop? So if it takes eight minutes, and that's how long it takes to write a citation and finish up with any reasonable suspicion that the officer may have developed, then eight minutes is fine. But if it takes eight minutes, and the officer is able to just sit around Googling things, or is able to get out of his car, stop writing the citation altogether, making no effort to investigate impairment, or write a citation, which were the two reasons he had the person here at this point. If he can give all that up, if it gives him time to not do things, then there's a problem. It's created free time. Do you have a problem with the fact that he did not use the computer that he had in the car? I have a problem. I think there is a problem. If something begins to take an unreasonable length of time, and the officer is not doing the things he should be, then yes, he should try… What if you were presented with somebody who's driving an out-of-state vehicle, who I think everything indicates that he is from out-of-state, and there's testimony that, and a finding that you get less information when you use the computer in the car, versus going through dispatch? I would say that, again, in McRae, out-of-state vehicle, out-of-state car, instantaneous, there is a finding in this case, then I would also argue that completeness is not a value that's recognized by this court. The government has not identified a single case that says it's reasonable to detain a passenger as long as it takes to get the most complete record possible, and again, I would say if we're doing the Fourth Amendment balancing, it seems to me highly counterintuitive that an officer is safer by staying around this hypothetically extremely dangerous person with no information about his criminal history. He's trying to find out if he's dangerous, he doesn't know. Right, and if he finished the traffic stop, he wouldn't be with that person anymore. That sounds like it's safer. Well, you know, he made a surreptitious move, what the officer thought maybe was hiding something under the seat. He thought it was drug-related, is the testimony that Trooper Tripodi gave on that. He indicated that he made a movement to put something under the seat, which could have been anything. Yes, but the testimony in the case is that he thought it was drug-related, and Trooper Tripodi did not indicate any officer safety concerns until he went to pull Mr. Tripodi out, or Mr. Mayville, sorry, out of the car at Trooper McElprang's request. So he sat there, or stood by the car for six minutes, had no officer safety concerns, asked him to come back, was refused, had no officer safety concerns. Sat in the car waiting, had no officer safety concerns. Did he testify each time, like you did there, I had no officer safety concerns? The first time he testified that he did have officer safety concerns was when he pulled Mr. Mayville out of the car, and at that point decided he needed to frisk him because, and then it was not because he put something under the car. Trooper Tripodi said, I had officer safety concerns because he seemed impaired, which he'd seemed all along, and because he'd refused at first request to get out of the car. So at no point was that stashing something. He did testify affirmatively that he thought it might be drug-related, which is why he wanted more time to investigate it. And I see that I've nearly exceeded my time, so if there are no further questions, thank you. Thank you. I'll just tell you, even though you exhausted your time, I'm going to give you an extra minute for your rebuttal. Good morning, Your Honors, Counsel. May it please the Court, my name is Stuart Young. I represent the United States, the appellee in this matter. Let me just get in here real quick, because I want to understand your position about the Fourth Amendment. Is it your position that on the Fourth Amendment, that as a right-line rule, always allows officers to run a triple-I background check? Your Honor, yes, we would say that under McRae, Santos, and even Rodriguez, which cites Holt itself, that as a rule, a triple-I check, if done appropriately, should be allowed during a traffic stop, especially for officer safety. Well, isn't that the argument in this case, whether it was done appropriately? The argument in this case is that it unreasonably prolonged the traffic stop. Well, but that means that it wasn't done appropriately, right? And I think it's important to kind of note some of the facts. This was a case where late at night, the defendant, driving, speeding, had furtively apparently put something, which looked possibly drug-related, according to Trooper Tripodi under the seat. Then it took approximately six minutes for Trooper Tripodi to interact with the appellant, where the appellant couldn't provide any registration, insurance, especially it was an out-of-state vehicle. He finally was able to produce a driver's license, but during that interaction, Trooper Tripodi asked the appellant three times, are you okay? We would argue that both the triple I check as a bright line rule is appropriate, but especially in this case, it was appropriate. It's also important to note that there's nothing in the testimony that Trooper Tripodi did nothing during the traffic stop. He testified that once he went back to his vehicle, he first contacted dispatch for the records, including the triple I. He then contacted the narcotic detector, requested dispatch for a narcotic detector dog, and then began to fill out the citation. Why does the request for the dog sniff relate to the ground for reasonable suspicion that he's impaired? How would a dog sniff, checking to see whether he had narcotics in the vehicle, relate to the ground for reasonable suspicion? We would argue that the dog sniff would demonstrate the presence of the odor of narcotics. That doesn't necessarily mean that narcotics are in the vehicle. That does sometimes mean that narcotics have just been smoked in the vehicle, as demonstrated by the fact that the methamphetamine pipe was found underneath the seat in the vehicle. So we would argue that that dog sniff was part and parcel of the investigation. We'll also argue, too, I think it's important to note, that Trooper Tripodi, as he was filling out the citation paperwork and whatnot, Trooper McElprine showed up, and Trooper Tripodi then backed his vehicle up. This is on the video at 159. Backed his vehicle up and indicated that was to do field sobriety tests at a later point. He then continued to fill out the citation. Is that right? I'm not saying that you're wrong, but my recollection of the testimony was that he didn't really remember and that he may have been doing... I'm sorry. Yes, he said possibly to do that. Yes. Thank you for that correction, Your Honor. He then, while he was filling out the citation, Trooper McElprine asked him to come to the vehicle. Trooper Tripodi continued his investigation, we would argue, because he continued to ask the appellant more questions, including, are you on some type of medication? Also asking him about his travel plans and asking whether or not he's okay. This is part and parcel of an investigatory stop to try to determine if somebody is impaired or not. Both McElprine and Trooper Tripodi both had those concerns. McElprine only interacted with the appellant for approximately a minute or so, and in that minute he testified very clearly that he had concerns about Mr. Mayville's sobriety as well. Because this goes back also to Judge Murphy's question earlier to opposing counsel. I'm sorry. Do you agree that we... I'm sorry. This goes back to a question that Judge Murphy asked of opposing counsel a minute ago. But do you agree that as to the Fourth Amendment, that we're going to look at that under a de novo, the reasonableness under a de novo review? I hope you say yes. So, yes, Your Honor. I mean, what you're required to do is to look at the facts. Okay, that's my next question. How do you maintain that we look at the district court's findings in regards to this matter? We believe the district court findings were not clearly erroneous and that there's ample evidence in the record of what the district court found. Now, Judge Murphy asked specifically, I believe it's Judge Murphy who asked specifically about the UHP computers and whatnot, and that's in volume four of 14, page 14, Trooper Tripodi specifically stated why he did it through dispatch rather than his computers. I do it through dispatch because our computers only give us certain information. A lot of times we'll see like a partial return. If things are from a different state, we don't always see it. So I know dispatch has access to more ways to check, so that's why I run it through dispatch. Now, that's not a completeness issue necessarily. Again, this check took about 11 or 12 minutes. That's all it is. The entirety of the traffic stop was 18 minutes. Let's look at Rodriguez for just a second. That was a 21-minute traffic stop, and after the traffic stop was completed, then the agents decided to run, or then the agents ran a dog around the vehicle, which took another seven to eight minutes. Now, in this case, while the III check is running in the background, Trooper Tripodi is filling out the citation. That's in the record. He said, I was filling out the citation. Now, counsel has some issues with him Googling things like Lake Havasu. Well, part of that is because Trooper Tripodi had asked the appellant where he was coming from and where he was going, and the appellant indicated Lake Havasu, and Trooper Tripodi was trying to understand those travel plans. And the Supreme Court has indicated that odd travel plans can be something for a trooper to have to develop further reasonable suspicion during that stop. With regard to impairment? I'm sorry, what? But not with regard to impairment. He's obviously trying to investigate the reasonableness of the travel plans to find out if he's a drug courier, not whether or not he's impaired. And that's fair, Your Honor, except for the fact that in this case, Trooper Tripodi stated a number of times he didn't know what was going on. Was he impaired? Was he trying to kind of malinger and try to not, you know, and try to throw off the trooper? I mean, Trooper Tripodi had no idea exactly what was going on, and he kept asking a number of times, are you okay? Are you on medication? Is there something wrong? And he even testified in front of the district court about how usually when somebody's stopped, they alert, they pick up. And in this case, that was not happening. So it's either impairment or something else. And again, I'm going to go back to the stashing of something underneath the seat, also a concern for Trooper Tripodi. Now, in terms of the questions that you asked the appellant, we believe that if a triple I check is reasonable, then the appellant does lose. But we would still argue that even if the triple I check itself, as a bright line rule, is not reasonable, that there was reasonable suspicion to continue the traffic stop. And that was both to run the dog, Trooper Tripodi had pulled the car back to possibly do field sobriety tests. And Trooper Tripodi, even while waiting for their triple I check, was doing further investigation by talking to Mr. Mayville. He wasn't sitting in his car doing nothing. He's talking to Mr. Mayville, trying to suss out exactly what was going on. And we would argue that for all of these reasons, both the running of the triple I check was reasonable and did not unreasonably prolong the stop. And that reasonable suspicion existed to continue that stop. Unless there's further questions, I'm happy to refresh my memory. How much time elapsed between the initiation of the stop and when the dog alerted? So the stop started at 145, but the initial contact didn't start until 146. And the dog alerted at, I believe, 204 and 53 seconds. And if I remember correctly, the alert came back at 205 and 45 seconds. The record that I read shows that the total deal was 19 minutes. Yeah, about 19 minutes. How much of that time of that 19 minutes was between the time of the initiation of the stop and when Mayville was able to locate his driver's license to hand it to him? So that initial six minutes was the interaction between Trooper Tripodi and Mr. Mayville. So he's waiting for the documents, some documents. He's waiting for the documents. And if you watch the video, what happens is Trooper Tripodi is talking to him. He's asking some questions. Where are you going? Where are you coming from? You know, those types of things. And while he's asking those questions, Mayville has kind of no ability to multitask, essentially. So he stops and answers the questions and then goes back and starts to look for the documents. And then there's another question and he kind of has issues multitasking. So from the time that Mayville finally located his driver's license to the time when the dog alerted was 13 minutes. Yes, let's see. It's about 1.52 to about 2.04. So about 12 minutes. We can do the math. I just thought you knew. Yeah. And I will say, I will say this. There is a point where Mr. Mayville provides the license, but he's still looking for the registration and the insurance. And finally, at about 1.52, 1.53 in the interaction on the video, Trooper Tripodi just says, oh, okay, look, don't worry about it. I'll try to find it. I'll try to figure it out. Because again, this is... So there's more than six minutes. It's about six minutes or so. And Trooper Tripodi ends the interaction because Mr. Mayville can't find the document, can't find those two documents. So... Thank you. Unless there's further questions, I'm happy to submit. We would request that you affirm the district court in this matter. Thank you, counsel. Thanks, Will. The III is approved by the Supreme Court as a category of things an officer may do to facilitate officer safety, but it is not treated the same way as the other four checks are, warrant, license, registration, proof of insurance. It is not the case that Rodriguez says that every particular instance of running a III is going to be reasonable. Is there any evidence in the record of how long it takes to do the other three checks in comparison to the III? It took 25 seconds in this case on the onboard computer before the officer knew there was a valid license, that the car was registered, and that it had insurance. And I do want to clarify that at 149.42, Mr. Mayville says that's the insurance right there. You can hear him on the audio saying that. So he had found the license and the insurance at that point. Before you heard back on the III from dispatch? Yes. It was 25 seconds to get returns on all of those. I've exceeded... So he activated not only the in-car computer, but also dispatch. I'm sorry, Judge Murphy, what was the question? He activated the in-car computer in addition to asking dispatch. Yes, first he did the onboard... Does the record indicate that he received more information from dispatch than he received in his check of the in-car computer? I don't think that that's clear from the record, because my recollection of the record is all we know is, from the III, is positive for criminal history. I don't know how much detail he ultimately got from that. Did he get that information, any information about criminal history, from his in-car computer? My understanding of the record is he didn't ask for it from the computer onboard. He said, he testified, I run it through dispatch. Does the record indicate that if you go beyond and ask for criminal history from your car computer, how much time that takes? No, we only have that it took 25 seconds to get what he did get from the car. I just want to make sure that I understood the exchange with Judge Murphy. So, all of that information is regarding ownership or registration. If I understand you correctly, your answer is that we just have nothing in the record about any onboard computer research, how long that would take for any criminal history. I believe that to be correct. I don't think the question was asked. I just want to make sure I understood. Thank you very much. Thank you. I do appreciate this matter will be submitted. I do appreciate, on behalf of our panel, the excellent advocacy, both in your written submissions and today.